# RICHES v. HADLOCK, Bank Com'r, et al.

No. 5290. Decided April 26, 1932. (15 P. [2d] 283.)
Rehearing Denied October 19, 1932.

266

*Badger, Rich & Rich,* of Salt Lake City, for plaintiff.

*Henry D. Moyle* and *W. W. Ray,* both of Salt Lake City, for defendants.

STRAUP, J.

This is an original proceeding by prohibition to restrain the district court and the bank commissioner from enforcing and carrying out an order of the district court authorizing and directing the commissioner in the matter of the liquidation of the Sugar Banking Company to borrow, from the Reconstruction Finance Corporation organized by an an act of Congress (15 USCA §§ 601-617), $150,000, and mortgage and pledge any and all of the assets of the bank to secure its payment. Upon a verified petition therefor, an alternative writ was issued to desist or show cause. At the same time there also was issued by us a writ of certiorari in aid of the writ of prohibition; and, in response

thereto, all the proceedings had in the district court with respect to the authority granted the commissioner were certified and transmitted to this court.

The substance of the petition here filed and upon which the alternative writ was granted is that the Sugar Banking Company was a corporation organized under the laws of Utah; that it was insolvent, and in pursuance of Laws of Utah 1921, c. 23, as amended by Laws 1923, c. 33, Walter H. Hadlock, the bank commissioner of Utah, took possession of the property and business of the bank, appointed Joseph N. Leggat as examiner, and put him in charge of the property and affairs of the bank for the purpose of liquidation; that on March 11, 1932, Hadlock, as such liquidating agent, filed his petition in the district court in and for Salt Lake county whereby he applied for an order that he be authorized and directed to negotiate a loan in the sum of $150,000, or so much thereof as could be obtained, from the Reconstruction Finance Corporation, to execute all necessary notes, mortgages, and other contracts in respect thereto, discount any and all notes and other obligations held by him as such liquidating agent, and to pledge, mortgage, hypothecate, and otherwise incumber any and all of the assets and property of the bank in his hands; and that, in pursuance of such petition, the court authorized and directed him to negotiate the loan and secure its payment as in the petition set forth. It further is alleged that the Reconstruction Finance Corporation would not make a loan to a banking or financial institution in process of liquidation, unless it is secured by at least one-third of the assets of the banking or financial institution, and that to secure the loan it will be necessary to pledge the assets of the bank "in an amount exceeding fifty per cent in excess of the amount borrowed as collateral security."

It then is alleged that the plaintiff, Riches, applying for the writ, is a depositor and stockholder of the bank; that his liability as a stockholder has been fully paid; that his claim as a depositor has been allowed; that only 20 per cent there-

of had been paid, and that the balance of 80 per cent remains unpaid; that the district court was without power or authority to order or direct the commissioner to obtain the loan for the purposes set forth in his petition filed in the district court; that the order was granted over Riches' objection and protest, and was in violation of law, and, unless restrained, the commissioner will apply for and obtain the loan, pledge any and all of the assets of the bank to secure its payment, and will do all acts ordered and directed by the district court, which if carried out, will increase the obligations and liabilities of the bank, imperil its assets, render the bank and the commissioner unable to repay the loan, and thereby cause a foreclosure and loss of the pledged assets, to plaintiff's irreparable injury.

The commissioner demurred to the petition filed herein, and caused the proceedings in the district court to be certified and transmitted to this court. In the petition filed by the commissioner in the district court, it in substance was alleged that he was the appointed, qualified, and acting bank commissioner of Utah; that the Sugar Banking Company became insolvent and closed its doors; that he took possession of the property and business of the bank; that he appointed Leggat as examiner, and put him in charge of the property and assets of the bank; that the examiner under orders of the court paid in full the preferred claims amounting to the sum of $52,298.34; that the commissioner paid to the depositors of the bank and common creditors 20 per cent of their claims filed and approved; "that the balance of the assets of the Sugar Banking Company now remaining on hand consisted of what is commonly called frozen assets"; that, since the payment of the last dividend of 10 per cent which was in September, 1931, insufficient funds had been collected in the liquidation of the bank to enable the payment of any further dividend; that it would be impossible from a liquidation of the assets of the bank to realize funds to pay any further dividends to depositors or creditors "within the next year, and then probably only a small dividend, not to exceed an additional ten per cent, unless this

petition is granted"; that, if the petitioner is compelled to force liquidation of the assets by sale under present depressed market conditions or by pressing collections of notes, irreparable loss would be suffered by the creditors and depositors; that, under orders of the court, the commissioner levied a 100 per cent stockholders' liability on all of the outstanding capital stock of the bank, and, although the commissioner endeavored, and would continue to endeavor, to enforce a strict liability on all directors of the bank, it nevertheless was believed that upon final liquidation it would be impossible to pay the creditors and depositors in full, "unless time be permitted to lapse before said frozen assets are forced into liquidation"; that the creditors and depositors were desirous of obtaining "further dividends from liquidation" as soon as possible; that, due to economic conditions of the country generally, "it is to the best interests of the depositors and creditors of said bank to receive dividends as speedily as possible"; that in many instances continued operations of the respective businesses and enterprises of the creditors and depositors were primarily dependent upon a speedy liquidation and recovery of their claims, and, unless speedily recovered, they will suffer irreparable loss.

He then alledged that the Reconstruction Finance Corporation was a corporation organized under a congressional act, and made special reference to section 5 thereof (15 USCA § 605); that, unless the petition to borrow $150,000 from the Reconstruction Finance Corporation be immediately granted, the available $200,000,000 which the corporation may loan for purposes set forth in the petition will be exhausted; that "in the opinion of the commissioner it is to the best interest of the depositors and creditors of the Sugar Banking Company that a loan of $150,000, or so large a portion thereof as possible, be obtained by your petitioner from the Reconstruction Finance Corporation, and that such amount as may be obtained be immediately distributed to the depositors and creditors of the Sugar Banking Company in the form of a dividend," and that the commissioner be

authorized and directed to contract for such loan and pledge the assets of the bank as in the petition set forth.

Upon presentation of the petition to the district court, a hearing thereof was fixed by the court on March 14, 1932, on notice to be given the attorney for the bank. No other or further notice was directed to be given. Written notice of the filing and hearing of the petition was served on the attorney for the bank on the same day the petition was filed. No other or further notice of any kind, by service or by publication or otherwise, was given to any one of the filing or hearing of the petition. The attorney for the bank made no appearance, and neither consented nor objected to the order applied for. On the hearing, Riches, the plaintiff herein and a depositor and stockholder of the bank, by counsel appeared and protested and objected to the granting of the order on the ground that the court was without power or authority to hear the petition or grant the order as prayed for, and that to grant it was in violation of law. The objection was overruled and the petition heard. The only evidence adduced was the testimony of Leggat, the examiner, who was called as a witness by counsel for the commissioner. After testifying he was the examiner, he was asked and answered:

"Q. You have filed a petition in this court (he had filed none but the Commissioner had) asking leave to apply to the Reconstruction Finance Corporation for a loan of $150,000.00, and for authorization to pledge the assets of The Sugar Banking Company. Have you gone into this matter sufficiently to state at this time whether or not, in your opinion, that is to the best interest of the depositors and stockholders and creditors of The Sugar Banking Company? A. It undoubtedly is.

"Q. In your opinion. You have already paid twenty per cent dividends upon all claims that have been filed with the court? A. Yes, sir.

"Q. And in your opinion will you be able to pay a further dividend during the current year if this petition is not granted and you proceed with the liquidation of the bank as you have heretofore done? A. No, sir.

"Mr. Moyle (Attorney for the Commissioner): I think that is all, your honor."

On cross-examination by counsel for Riches, the witness further testified it was his understanding that, under the rules and regulations of the Reconstruction Finance Corporation, a pledge of more than 50 per cent in addition or more than 50 per cent additional security than the amount of the loan was contemplated, and that at least one-third of the assets of the liquidating bank would have to be pledged, and that "in this particular case probably more than that"; that "we will have to pledge a good deal more than that in order to give the Reconstruction Finance Corporation sufficient collateral to secure their loan in the event that they make it"; that the loan would be for the term of three years, with interest at $5\frac{1}{2}$ or 6 per cent per annum, and that "it is contemplated by this petition that the present assets should be mortgaged, hypothecated or pledged for the purpose of obtaining funds with which to pay creditors a dividend."

That was all the evidence adduced at the hearing. Upon that the district court, in granting the order, recited that "the court having heard the evidence adduced by the petitioner and by the protestant (none was adduced by the protestant), and the matter having been submitted the court now finds that it is to the best interests of the depositors, stockholders and creditors of the Sugar Banking Company that the petition be granted, as prayed for, (which is a mere conclusion and barren of any facts found or testified to,) and that said petition should be granted as prayed for, and that the protest of the said J. C. Riches should be denied"; and thereupon the court entered an order authorizing and directing the commissioner and examiner to borrow $150,-000, or so much thereof as could be obtained, from the Reconstruction Finance Corporation for the use and purposes as in the petition set forth and to mortgage and pledge any and all of the assets of the bank to secure its payment as in the petition alleged.

We have a statute, Comp. Laws Utah 1917, chapter 6 of title 19 (section 971 et seq.), relating to the "State Banking

Department," and to the appointment of a bank commissioner by the Governor of the state with the advice and consent of the Senate, and which prescribes his duties and powers. In 1921, Laws 1921, c. 23, further legislation was had relating to the "Suspension and Liquidation of Banks," which, as amended by Laws 1923, c. 33, so far as here material, provides, that, when a bank to which the act is applicable becomes insolvent, the commissioner is authorized without aid of court to forthwith take possession of the property and the business of the bank; that, upon taking possession, he forthwith is required to give notice of such fact to all persons, companies, etc., "holding or in possession of any assets of such bank," and within a prescribed time give notice by advertisements in newspapers as he may direct, calling on all persons "who may have claims against such bank to present the same to the bank commissioner," and to give a similar notice to all persons whose names appear as creditors upon the books of the bank, and to liquidate its assets. Such laws empower the commissioner without the aid or approval of the court to appoint one or more special examiners and assistants to assist him in the liquidation and to convert the assets coming into his or their hands into cash and account therefor and make distribution thereof (Laws 1921, c. 23, § 1 et. seq.). Such laws (Laws 1921, c. 23, § 7, as amended by Laws 1923, c. 33) further provide that:

"Upon taking possession of the property and business of such bank, the bank commissioner is authorized to collect money due to such bank, and to do such other acts as are necessary to preserve its assets and business, and shall proceed to liquidate the affairs thereof, as hereinafter provided. The bank commissioner shall collect all debts due and claims belonging to it, and upon the order of the district court in and for the county in which the office of such bank is located, may sell or compound all bad or doubtful debts, and on like order may sell the real estate and personal property of such bank, on such terms as the court shall direct."

They (Laws 1921, c. 23 § 10, as amended by Laws 1923, c. 33) further provide that, at any time after the expiration

of the date fixed for the presentation of claims, the commissioner may "out of the funds remaining in his hands after the payment of expenses, declare one or more dividends, and after the expiration of one year from the first publication of notice to creditors, he may declare a final dividend, such dividends to be paid to such persons and in such amounts and upon such notice as may be directed by the district court of the county in which the office of such bank was located."

And finally the act (Laws 1921, c. 23, § 13) provides that:
"No receiver shall be appointed by any court, nor shall any deed of assignment for the benefit of creditors be filed in any district court within this state for any bank except upon notice to the bank commissioner, unless in case of urgent necessity it becomes in the judgment of the court necessary so to do in order to preserve the assets of such bank. The bank commissioner may within five days after the service of such notice upon him take possession of such bank, in which case no further proceedings shall be had upon such application for the appointment of receiver or under such deed of assignment, or, if a receiver has been appointed or such assignee shall have entered upon the administration of his trust, such appointment shall be vacated or such assignee shall be removed upon application of the bank commissioner to the proper court therefor, and the bank commissioner shall proceed in all such cases to administer the assets of such bank, as herein provided."

When the application for the alternative writ was applied for, counsel applying for it as well as counsel representing the commissioner stated that, inasmuch as the banking company was not a national bank, but one organized under the laws of Utah, the Reconstruction Finance Corporation would not make a loan to such a bank in process of liquidation, unless it was determined by the court of last resort that the commissioner or liquidating agent was authorized and empowered to contract for the loan, or that the courts of such state had authority to confer, and had conferred, such power upon him, and authrized and directed him to do so. We thus were urged to take original jurisdiction, grant the

alternative writ, and on the return thereof hear the matter on merits, which was done.

By the statute referred to it is clear that as to banks and banking institutions the Legislature in such case took from the courts, or attempted to do so, their timehonored equity or chancery prerogatives in the appointment of receivers and in directing and controlling them as ■ officers of the court. The competency of the Legislature so to do is not on this proceeding presented or challenged. With the wisdom of the legislation we are not concerned. Under the statute, the taking possession of the property and business of a bank or banking institution by the bank commissioner is not as an officer of a court. His custody of the property is not, as is the custody of a receiver appointed by the court, the custody of the court. Under the statute, the commissioner takes possession and holds it without the aid of, and despite, judicial action. It is of little moment what the commissioner be called, whether a statutory receiver, or what not. It, perhaps, is best to call him what the Legislature called him, the bank commissioner, with powers and duties conferred upon him as prescribed by the Legislature. He is a mere executive creature of the statute, not of the court, and can exercise only such powers as the statute has given him; and no order of the court applied for can be broader than the statute. In other words, he is a public agent or officer of the state and derives his powers from the statute. Alderson on Receivers, § 225; 1 Clark on Receivers (2d Ed.) 17; 1 Tardy's Smith on Receivers (2d Ed.) 196; 2 Tardy's Smith on Receivers (2d Ed.) 1241, 1249; *Ex parte Chetwood,* 165 U. S. 443, 17 S. Ct. 385, 41 L. Ed. 782; *Van Meter* v. *State,* 132 Okl. 230, 270 P. 41; *Amer. Southern Nat. Bank* v. *Smith,* 170 Ky. 512, 186 S. W. 482, Ann. Cas. 1918B, 959; *Ex parte Smith,* 160 Ky. 83, 169 S. W. 582; *Kinney* v. *Channel State Bank* (Tex. Civ. App.) 288 S. W. 590; *Cochran* v. *Bennett,* 37 Ga. App. 202, 139 S. E. 428; *Bennett, Supt. of Banks,* v. *Green,* 156 Ga. 572, 119 S. E. 620; *Isaac* v. *Marcus,* 258 N. Y. 257, 179

N. E. 487; *Hannah* v. *Moberly Bank,* 67 Mo. 678; *Hoff* v. *First State Bank,* 174 Minn. 36, 218 N. W. 238; *In re Farmers' Exchange Bank,* 55 S. D. 190, 225 N. W. 307; *In re La Fayette Bank & Trust Co.,* 198 N. C. 783, 153 S. E. 452; *Scribner State Bank* v. *Ransom,* 35 S. D. 244, 151 N. W. 1023.

This, however, is not to be confused with statutory provisions of other jurisdictions, where the creation of the office of a commissioner or liquidating agent is by statute or by means other than by appointment by the court, but where he nevertheless, in the discharge of his duties in administering the property and assets of the bank, is required to obtain orders and direction of the court, and is under its orders and direction similar to a chancery receiver. Under such statutes it may be said there is no real distinction between a so-called statutory and a chancery receiver. But that is not the case under the laws of this state creating the bank commissioner.

It, however, is claimed that he is nothing more than a statutory receiver with all the powers of a chancery receiver appointed by the court and subject to the same direction and control by the court. Such a view renders the enactment in question futile and contrary to its avowed purpose. Among other citations the case of *National Surety Co.* v. *Pixton,* 60 Utah 289, 208 P. 878, 881, 24 A. L. R. 1487, is cited as supporting the claim that the commissioner in effect is the same as a receiver appointed by the court; and reference made to the following quoted statement in that case: "In view, therefore, that the assets of the bank had passed into the hands of the Bank Commissioner for the purpose of winding up the bank's affairs for the benefit of its creditors, the legal effect of what was done is precisely the same as though a receiver had been appointed or an assignment for the benefit of creditors had been made. To say that the legal effect is not the same is to make a distinction where there is no substantial difference. The law always looks to the substance and purpose of things rather than to mere form. We are of the opinion, therefore, that although it be con-

ceded that in this state the right of priority by virtue of the common law which has been adopted exists in favor of the state, yet, that the right, for the reasons stated, was not enforceable when plaintiff asserted the same."

Such language must be considered in connection with the question then before the court for review and determination. What was there involved and decided was whether a surety company, having guaranteed the repayment of funds deposited in a bank by the state treasurer, and upon the bank becoming insolvent and its property and assets taken over by the bank commissioner, and the surety company having paid its surety obligation, stood in such a relation to the assets of the bank as would the state itself had the obligation not been paid and thus had a priority over all other claims against the bank. The holding was that title to the property passed to the bank commissioner when he took the property over, and, because no claim of priority was made by the state before he did so, its priority right, if it had any, was lost when the surety company asserted its priority and that its right could not be better than that of the state. In connection with that the court, among other things, stated that the assets of the bank had passed beyond the bank's control, and had passed into the possession and control of the officer, whose duty it was to administer the assets of the insolvent bank, the proceedings of which were had before any claim of priority was made on behalf of the state, and that in fact the state asserted no such claim, and hence the priority right of the state, if it had such right, ceased to be effective when the surety company attempted to assert its right. Then follows the quotation referred to by counsel.

It is thus seen that the sole question there was as to the right of the surety company to priority over other claimants; and that the question as to the authority or power of the bank commissioner or to what extent he was subject to the control or direction of the court, or as to the particulars in which his duties and powers were similar or dissimilar

to those of a chancery receiver, in no sense was before the court, considered, or decided. Nor does the cited case of *Walker Bros., Bankers,* v. *Intermountain Milling Co.,* 65 Utah 340, 237 P. 228, throw any light on the question in hand.

A striking dissimilarity between a chancery receiver and the bank commissioner as here created by the statute is, that the former is a creature and an officer of the court, who in all primary matters is under the orders and directions of the court and whose custody of property and assets of the bank is the custody of the court to be administered under its orders and directions, while the latter is a creature and a public officer of the state, whose custody of the property and assets of the bank is not the custody of the court, and where the assets are to be administered by him without aid or direction of the court, except as by the statute otherwise provided. Thus, in determining what power in the premises may be exercised by the commissioner or what orders or directions may be given him by the court, we must look to the statute. It provides that the commissioner, without aid of the court, may on nine enumerated grounds, among which is the ground of insolvency, take possession of the business and property of any bank to which the act is applicable; appoint one or more deputy examiners; give notice to creditors to present claims to him; make an inventory of the assets and file one copy in the office of the commissioner and one in the office of the county clerk of the county in which the office of the bank is located; make a list of the claims presented specifying what are allowed and what rejected, and file a copy of the list in his office and a copy in the office of the county clerk; appoint deputies, assistants, clerks, examiners, and counsel, and fix their compensation; that on taking possession of the property and business of a bank he is authorized to collect money due the bank and to do such other acts as are necessary to preserve its assets and proceed to liquidate the affairs thereof; collect all debts due and claims belonging

to the bank; and that on the order of the district court in and for the county in which the office of the bank is located may sell or compound bad or doubtful debts, and on like order sell real estate and personal property of the bank on such terms as the court may direct; that, after the expiration of the date fixed for the presentation of claims, dividends declared by him are to be paid to such persons and in such amount and upon such notice as the court in the county in which the bank is located may direct; that the allowance of expenses paid to assistants, clerks, examiners, and counsel is subject to the approval of the court; and that claims to which objections have been made and not rejected by him shall be presented to the district court for hearing.

We have thus enumerated the principal things which under the statute the commissioner may do without aid of the court and in what particulars he is required to have the approval of the court. We do that because mindful of the general rule and as stated in 1 Tardy's Smith on Receivers, 196, that statutory receivers "derive their general powers wholly from the statute under which they are appointed, and have no powers except those conferred by it, either by express terms or such as can be fairly implied from the general scope of the statute, or as an incident to an express power given," and that the scope of their powers is limited and special. The doctrine that the powers of a receiver are special and limited applies in a large degree to all receivers, including a bank receiver whose authority is as defined by statute or the order appointing him. 3 Michie on Banks and Banking (Perm. Ed.) § 149. There is not anything in the statute, however broadly it may be considered, that either expressly or by implication confers authority on the commissioner to borrow money and pledge the assets of the bank to secure its payment, especially to borrow money to pay dividends. No such claim is made by the commissioner. To the contrary, it is conceded by counsel for both parties, and the case is presented on the theory, that the commissioner, without judicial aid and sanction, has no authority

to borrow money for the purposes indicated and pledge the assets to secure its payment, and for that reason he applied to the court for authority and direction to do so. The statute provides that he, on order of the district court, may sell or compound bad or doubtful debts, and real estate and personal property, on such terms as the court may direct. But the commissioner did not apply to the court to sell real estate or personal property or to sell or compound bad or doubtful debts. No claim is made that the petition filed by the commissioner was for such purpose. It was not even alleged, shown, or found that there was any real or personal property or any bad or doubtful debts. Nor, because the statute authorized the court to direct the commissioner to sell real or personal property, is the claim made that the court thereby was also authorized to direct him to borrow money and pledge any and all of the assets to secure its payment to pay dividends to creditors. And, were such a claim made, it would be untenable (*Golinsky* v. *Allison*, 114 Cal. 458, 46 P. 295; *Campbell* v. *Foster Home Ass'n.*, 163 Pa. 609, 30 A. 222, 26 L. R. A. 117, 43 Am. St. Rep. 818), nor under our statutory laws relating to mortgages and pledges may any one successfully contend that mortgaging or pledging property to secure payment of a loan or debt is a sale of the property.

The claim here made is that, since the statute authorized the commissioner, on taking possession of the property and business of a bank, "to collect money due such bank and to do such other acts as are necessary to preserve its assets and business and shall proceed to liquidate the affairs thereof," the court, to preserve the assets, was authorized to grant the order directing the commissioner to borrow money, and pledge any and all the assets, to pay dividends; that is to say, though the statute without judicial sanction did not authorize the commissioner to so borrow money and pledge the assets, yet equity, when properly invoked, could direct him to do so. We need not pause to inquire whether, by applying the familiar maxim "ejusdem generis," the general

words "to preserve assets" are or are not to be restricted to the enumeration of the specific things preceding them. However, were the maxim applied and given effect, it is clear such general terms could not be given a meaning to borrow money and pledge assets to pay dividends without doing violence to language. It further is to be observed that the language referred to pertains to the authority given the commissioner and not to the court.

In the next place, it must not be overlooked or pushed aside that the property and assets here were not in custodia legis as is the case when a receiver is appointed by the court and the estate administered under its orders and direction. The assets were not in the hands of any judicial executive officer appointed by the court, but were in the hands of a nonjudicial executive public officer whom chancery under the statute may not, as it may a chancery receiver appointed by the court, direct or control in the proper discharge of his public duties, except as is by the statute prescribed. Chancery receivers may be directed and authorized by the court appointing them to do various things, even in some instances to borrow money to preserve property and assets in the hands of the receiver or to protect or care for it. While the Legislature left to the courts their equity prerogatives and jurisdiction theretofore exercised by them in the appointment of receivers and in ordering and directing them in the administration of assets in all cases where appointments of receivers are cognizable, yet, as to banks and banking institutions organized under the laws of the state, it curtailed or restricted the power of the courts in such particular, and conferred powers on a mere executive public officer of the state which theretofore were exercised by the courts. Whether such course is wise or unwise, the Legislature and not we must take the responsibility. While injunctions, mandates, prohibitions, and other remedies of judicial cognizance may, as in all other cases, be invoked to keep the commissioner within his jurisdiction, prevent abuse, or an arbitrary exercise of power, the commission of

waste, depletion of assets, and other wrongful acts, still the court may not, as in the case of a chancery receiver appointed by the court, control the commissioner in the lawful and proper discharge of his duties in administering the assets of a bank intrusted to him, not by the court, but by the Legislature, except as provided by the statute wherein the approval of the court is required. If the commissioner without aid of the court was about to borrow money for the purposes indicated by his petition, and was without power or authority to do so, judicial action could be invoked to arrest such threatened action. If he has no such power, the court may not lawfully confer it, unless the statute permits it or unless the court may do so under its general equity powers. As has been seen, no such express authority is given by the statute, nor is it implied from any of the express powers conferred on the court. The want of power of the court in such and in other particulars is recognized by the Code Commission, and hence an amendment is proposed by it whereby the court is given jurisdiction and control over all proceedings of the bank commissioner in the liquidation of the affairs of the bank or institution taken over by him.

Thus, if the court now has power in the premises to grant the order complained of, it must be derived from its general equity powers and jurisdiction. Though it be assumed the district court of the county in which the bank is located under its general equity jurisdiction and when its action is properly invoked has power to advise and direct the commissioner with respect to borrowing money and mortgaging and pledging the assets to secure its payment, which a chancery receiver or the commissioner without judicial sanction may not do, yet no sufficient facts were alleged nor proven to justify or authorize the order granted by the court. A receiver has no right to borrow or loan money, unless specially authorized by the court, and, if he does so, he becomes personally liable for whatever loss may be sustained. 23 R. C. L. 72, § 77. The power of a

court of equity, says the author, 1 Clark on Receivers (2d Ed.) § 455, to raise money necessary for the preservation and management of the property and make the same chargeable as a charge thereon for its payment, is to be exercised with great caution, and, if possible, with the consent or acquiescence of the parties interested in the fund. In 1 Tardy's Smith on Receivers (2d Ed.) 205 it is said that the power is to be exercised with great caution, that the power to mortgage is in principle the same as the power to issue receiver's certificates and make them a first lien on the property, and that there must be the gravest necessity to justify an order of that kind.

It is urged the order here applied for and granted was "to preserve" the assets of the bank. What the assets were, whether real or personal, or the nature, character, quality, or value of them, was neither alleged nor proven, except that what remained were "frozen assets," and that not anything could be realized on them for a year or more; hence the commissioner asked to be authorized to borrow $150,000 and pledge any and all of the assets to secure its payment, not to preserve assets, but to pay dividends. Instances may be conceived where to borrow money to pay taxes or to discharge liens on property in which the bank held equities subject thereto, or to repair, prevent waste or destruction of, property, or otherwise to care for and maintain it, might well be regarded as necessary to preserve it. But not anything of that kind was alleged or shown. On the contrary, the essential alleged purpose was to borrow money to pay dividends. While it is alleged that all preferred claims amounting to $52,298.34 and 20 per cent of claims of the depositors and common creditors had been paid, yet what amount was so paid to depositors or creditors or what amount of approved claims remained unpaid, or the character, quality, or value of the assets remaining with which to pay them, was not alleged nor shown. It was alleged it would be impossible through liquidation of the assets now in the hands of the commissioner to "prop-

erly, economically and in an orderly manner" realize funds to pay any further dividends within the next year, and then probably only a small dividend not to exceed an additional 10 per cent, unless the petition of the commissioner was granted; that to force liquidation by sale of assets upon the present depressed market, or by unduly pressing collections of notes, irreparable loss would be suffered by depositors and creditors, and that it was to their best interests to borrow $150,000 to be paid to them as dividends and pledge any and all of the assets to secure its payment, which, in the main, are allegations of mere conclusions. The court's finding that to grant the order "was to the best interests of the depositors and creditors" does not mean much of anything. Nor is the matter helped by the further allegation of the petition that "irreparable loss will be suffered by the depositors and creditors," if the loan is not permitted. To authorize and justify borrowing money and pledging the assets to secure its payment, a clear necessity therefor to preserve or protect property was required to be shown. *Oldroyd* v. *McCrea*, 65 Utah 142, 235 P. 580, 40 A. L. R. 230. Since the borrowed money is not to be used to protect, maintain, or care for property, but to pay dividends, it is difficult to perceive how borrowing $150,000 for such purpose with interest, pledging the assets to secure its payment, and thereby add $150,000 with accrued interest, costs, and expenses to an already existing indebtedness of the insolvent unable to pay more than 20 per cent of claims of common creditors, and leaving no means or source with which to pay either principal or interest of the loan as it matures except on foreclosure with further costs and expenses, may be regarded as preserving assets. As difficult is it to see how to do so would be to the best interests of the depositors and creditors, unless it was thought that all that could further be realized on their unpaid claims would be a distribution of the borrowed money which might amount to more than could be realized from liquidating the assets without borrowing money, and let the Finance Corporation bear whatever

deficit might result. A going concern, though in financial straits, may be aided by borrowing money to continue in business or to rehabilitate itself, still it is hard to see how an insolvent concern which has ceased to function and whose property and assets, wholly insufficient to pay its liabilities, have been taken over by another for liquidation, may be aided or its creditors benefited by borrowing money and pledging its assets to secure its payment and thereby increase the indebtedness, unless it be clearly shown such money was necessary to protect property against loss or destruction.

We are not unmindful of the contention that, because of financial and abnormal conditions and of deflated prices of about all kinds of property below its real value, to go forward with liquidation of the assets in the ordinary course and convert them into cash will result in a sacrifice of the assets and a corresponding diminution of cash to be realized from a present liquidation. Whatever basis there may be for such a contention rests in a delay or partial suspension of liquidation, or a forbearance in pressing collections and foreclosures, thereby avoiding assets to be forced on an unfavorable market, which involves, not a preservation of assets, but a gamble and speculation in future values, the result of which, after all, must be assumed and borne by the creditors and not by a prospective lender, for whatever loan may be made by him secured alone by assets will be made on their present and not on future speculative values. In the liquidation of assets, the commissioner may not in all cases, be required to pursue an immediate or speedy liquidation and force collaterals and properties on an unfavorable market when to do so will result in sacrificing them, which, in the exercise of a sound discretion, may be avoided by a reasonable forbearance. But that may be done and such a discretion exercised without the commissioner being authorized to borrow money to pay dividends more promptly than he otherwise might be able to do, and thereby greatly increase the indebtedness and costs and expenses. The more

important question is, not how much the creditors may now realize from a distribution of borrowed money, which with accrued interest, costs, and expenses must be repaid, but how much may ultimately be realized by them out of the assets without increased and unnecessary burdens put upon them.

If, as assumed by all concerned, the statute without judicial sanction does not authorize the commissioner to borrow money for the purposes indicated and that judicial direction is essential, it is just as essential that a proper and sufficient petition or initial pleading of some kind be filed to invoke judicial action (*Stockyards Nat. Bank* v. *Bragg,* 67 Utah 60, 245 P. 966), which here was not done, and that the court, before giving such authority and direction, be properly advised as to the necessity and utility thereof, the terms and conditions of the contract required to be entered into to obtain the loan, the kind and value of assets on hand, and the amount thereof required to secure its payment. Unless the court is so advised, it is unable to exercise a sound discretion in determining whether the authority and direction should or should not be granted, and is made a mere figurehead in the premises. Here, without being advised as to the amount of the loan that may be had and the terms and conditions under which it may be obtained, what assets or how much thereof were required to be pledged to secure its payment, the amount of unpaid claims or the necessity of immediate partial payments of them, or the character, value, or amount of assets on hand, the court empowered and ordered the commissioner to go forth and borrow from the Finance Corporation $150,000 or as much thereof as he could get, to enter into any and all kinds of contracts to get it, and whatever amount he was able to get, whether much or little, to pledge, if necessary, everything he had, frozen and unfrozen, to secure its payment.

To support the order granted by the district court, the commissioner, among other citations, refers to the recent case of *Martin* v. *Citizens' Bank,* 134 Kan. 650, 8 P. (2d) 81.

It is readily seen that case involved a question different from that here involved and too with respect to a statute, so far as here material, unlike our statute; nor is there anything there stated or decided which lends any support to the commissioner's contention.

A further point is made. As is seen, the court directed and ordered the commissioner to mortgage and pledge, if necessary, all of the property and assets in his hands to secure the payment of whatever amount of money, not to exceed $150,000, he was able to borrow from the Reconstruction Finance Corporation. It is urged that, in view of the statute, Laws Utah 1925, c. 44, p. 103, § 1006, the court in no event had authority to do that. The portion of the section referred to provides that: "No bank or bank officer shall give preference to any depositor or creditor by pledging the assets of the bank as security; provided, that commercial banks may borrow money for temporary purposes, and may pledge assets of the bank not exceeding 50 per cent in excess of the amount borrowed as collateral security therefor," etc.

While it is not alleged, yet the case is presented on the theory that the bank is and was a commercial bank. The argument is that, inasmuch as the bank itself could not for any purpose have pledged its assets for collateral security to exceed 50 per cent in excess of the amount borrowed, the commissioner could not nor could the court properly direct and order him to do so; and that, by the court directing and ordering all of the assets to be pledged, it in effect transferred the liquidation of the assets to the Finance Corporation, or at least gave it power to direct and control the liquidation, a function and power conferred upon the commissioner by the statute and required to be performed by him. The general rule is that a receiver appointed for the purpose of winding up the affairs of an insolvent concern and subjecting its property to the payment of its creditors stands in the shoes of such concern, and possesses no rights with respect to the trust property superior to those which would

be possessed by such concern, were it a going concern acting for itself. *Hastings* v. *Lincoln Trust Co.*, 115 Wash. 492, 197 P. 627, 18 A. L. R. 583; 1 Clark on Receivers (2d Ed.) 477; 3 Michie on Banks and Banking (Perm. Ed.) ch. 6, § 96; 7 Thompson on Corporations (3d Ed.) § 5173; *Lincoln* v. *Fitch*, 42 Me. 456; *State ex rel Spillman* v. *Farmers' State Bank*, 114 Neb. 826, 211 N. W. 18; *Jordan* v. *Harris*, 98 Ark. 200, 135 S. W. 830; *Crum* v. *Emmett*, 197 Iowa, 1160, 196 N. W. 982; *Van Meter* v. *State*, supra. There are exceptions to this, as noted in 8 Thompson on Corporations (3d Ed.) § 6346, and by some of the cases just cited, wherein the receiver is given the right to litigate for the benefit of creditors where acts have been done in fraud of their rights and where the insolvent concern might not be able to do so were it a going concern, other instances where the receiver could maintain an action though the bank itself might not had it been a going concern, or where a party sued by the receiver was estopped from asserting defenses which might have been interposed had the action been brought by the bank if a going concern. But these and other exceptions noted by the cases and text-writers are here not involved and do not concern us. Since the bank, a mere private corporation, had it been a going concern, would have been forbidden from pledging all of its assets to borrow money for any purpose, we think the court was unauthorized to direct the commissioner to do so for the use and purpose stated in his petition, especially as neither the character nor value of the assets was disclosed, or to what extent the process of liquidation could go forward without hindrance or interference and without making the lender and pledge itself either directly or indirectly the liquidating agent.

There is still a further question, that of notice. As is seen, the only notice given of the filing and hearing of the petition filed in the district court was to the attorney of the bank who defaulted. The failure to give notice to depositors or to creditors or to stockholders evidently was justified on the theory that the commis-

sioner represented all those, and in such representative capacity acted for and bound them in all that the commissioner did or might do in the premises, or that the bank represented them, and hence they, though directly interested in the fund and in the administration and distribution of it, were not entitled to notice or to be heard in the matter, except on grounds of fraud, collusion, or bad faith. Let it be conceded that, when the commissioner takes possession of the property and business of a bank, he does so for the benefit of all depositors, creditors, and all those interested therein, and to liquidate the assets for their use and benefit. Still he does not do that, as in the case of a chancery receiver, by choice or appointment, nor upon proceedings in which the bank or those directly interested in its affairs have a voice or right to be heard. When a bank in fact is insolvent, the commissioner may do all that, and appoint his examiner or examiners and put them in charge of the bank and liquidate its assets, despite objections and without advice of or consultation with the bank or of those directly interested therein, and without aid or intervention of judicial action except in the particulars by the statute indicated. When a bank becomes insolvent and the commissioner takes possession and charge of its property and assets, its entire management is turned over to the commissioner, and the bank, though not dissolved, yet ceases to function, and hence those who become and are most directly interested in its affairs are its stockholders, depositors, and creditors, for whose benefit the property and assets are to be administered. When large sums of money as here are sought to be borrowed and all the property and assets of the bank to be mortgaged and pledged to secure the payment thereof and such pledges made paramount liens over everything except costs and expenses of administration, it is as important that the depositors, cerditors, and stockholders be given some kind of notice and an opportunity to be heard as it is to give notice to the attorney of the bank, especially when he on behalf of the bank merely defaults and enters no appear-

ance for any one. We are of the opinion that some kind of notice was required to be given depositors, creditors, and stockholders to afford them an opportunity to be heard before granting the order in question. 1 Clark on Receivers, supra; *Byrnes* v. *Missouri Nat. Bank* (C. C. A.) 7 F. (2d) 978; *Oldroyd* v. *McCrea*, supra; *In re Gutterson & Gould Lebanon Iron & Steel Co.* (C. C.) 151 F. 72; *People* v. *Family Fund Soc.*, 31 App. Div. 166, 52 N. Y. S. 867. We think that especially true when, as here, the property or fund sought to be mortgaged or pledged was not in the custody of or being administered by the court or under its orders or directions as in the case of a chancery receiver, and upon the further consideration that the power of a court of equity to authorize a receiver to borrow money and pledge assets in his hands to secure its payment is, as to private corporations, to be exercised with great caution and within limitations of a clear necessity to preserve the existence of property or to save it from destruction. We do not say such notice is required to be given by personal service. It may suffice if given by publication or by some other appropriate method as may be directed by the court. If, without notice, those directly interested, such as creditors, depositor, or stockholders, appear and challenge the necessity or utility of granting the demanded order, surely their right to be heard would not be denied them. It was not denied Riches. If in such case they are entitled to be heard, then **are they also** entitled to some reasonable notice to afford opportunity to be heard. In the administration of estates of insolvents, where rights and interests of creditors and others are directly involved, and where what is demanded may adversely or injuriously affect them, courts, as in the administration of estates of deceased persons, do not sit as mere umpires, but as a court of chancery charged with the duty and responsibility in the administration of trust funds and property on established principles of equity giving to those directly interested therein opportunity to be heard before granting final orders which may adversely or in-

juriously affect their rights. Because of statutory liabilities of directors and stockholders of a bank and banking institutions, it is readily perceived that conflicting rights and claims may arise between them and depositors and other creditors, and, where the commissioner, though in good faith, may favor the claims of the one as against the other, and thus, before at his request, permission is given him to borrow a large sum of money, here $150,000, and pledge all the assets, or the most valuable portions thereof, to secure its payment and make such pledges paramount liens over everything except costs and expenses, those most directly interested in the premises and whose rights may be adversely affected are entitled to notice and an opportunity to be heard.

The allegation in the petition of the commissioner filed in the district court that the depositors and creditors are "anxious and desirous of obtaining further dividends" as speedily as possible is nothing more than that they are, as creditors generally are, anxious to have debts due them paid, but is not equivalent to an allegation of their consent that permission be given the commissioner to borrow the sums of money as in the petition set forth. And, though it were, yet would be futile as constituting notice.

Because as represented to us that the Reconstruction Finance Corporation would not make the loan unless authorized by the court of last resort, and because the proceeding here initiated is more or less friendly, we have given the matter more than ordinary attention. With the result reached, we are guided alone by what we regard the scope and power conferred on the commissioner and the court by the statute and by well-established principles of law relating to receivers and applicable to the matter in hand; that the commissioner, though a public officer, nevertheless is a quasi trustee dealing with trust funds and property whose scope of powers with respect thereto is not unbounded but is limited and special; that, in the absence of the statute

prescribing it, whatever control or direction the court under its general equity power has over him, it is no greater than over a chancery receiver; that, as to such a receiver, the court may not, as to a mere private corporation, authorize or direct him to borrow money and secure it by mortgages or pledges on assets in his custody and make them paramount liens, except on clear necessity to preserve the existence of property or to save it from destruction (*Oldroyd* v. *McCrea,* supra), which here is not shown; and that correct conclusions with respect to the matter in hand may not be aided by exigencies of the hour, or by mere sentiment or desire. Nor does the statement or claim that, since the money proposed to be borrowed is not to be used, as it is not, to carry on or continue the business or pay the expenses of operations of the insolvent concern, and though the court as to a mere private corporation, different from a railroad or other public utility, is not authorized to direct the receiver to borrow money and mortgage or pledge the assets for such purpose, argue or show that the court here was authorized to direct a receiver of a mere private corporation to borrow money and pledge or mortgage all its assets to secure its payment, to pay dividends to creditors. Because the court may not do the one does not prove he may do the other, unless the former is the only restriction placed on the court, which is not the case. The general rule is, and as we think is well established by the authorities, that as to a mere private corporation the court is neither justified nor authorized to direct the receiver to borrow money and pledge or mortgage the assets to secure its payment and make such mortgages or pledges paramount liens, except for a clear necessity to preserve property; and that "in the case of a private corporation this necessity is made the criterion," and that "all the facts should be exhibited which make the necessity apparent, all the parties affected should be notified, and a full hearing accorded to all objectors." *Lockport Felt Co.* v. *United Box Board & Paper Co.,* 74 N. J. Eq. 686, 70 A. 980, 983, and cases noted in 40 A. L. R.

244. These principles are not dependent upon, nor controlled by, the charity or supposed generosity of the lender.

On the petition and on the record we are of the opinion that the court was neither authorized nor justified to grant the order. Thus let the writ heretofore issued be made permanent. Let it be prepared by counsel and submitted.

ELIAS HANSEN and EPHRAIM HANSON, JJ., concur.

CHERRY, C. J. (dissenting).

I am not able to agree to the conclusion reached by the majority. We are dealing here with a new question. It is not the usual case of a receiver's power to borrow money to be expended in expenses of administration. Borrowing money for that purpose is of doubtful expediency in most cases, and so subject to abuse that the courts, although not denying the power, have hedged it about with restrictions and limitations. But here the situation is wholly different. The national government, as a measure of relief to the creditors of suspended banks, through the Reconstruction Finance Corporation, offers to lend money to be distributed to creditors for the avowed purpose of relieving them, so that the time for liquidation of the assets of the insolvent may be extended and the losses consequent upon a forced disposition of assets in time of financial depression be avoided. The scheme is designed for the exclusive benefit of the creditors. Its benefit to them is not doubtful. The money to be lent does not go for expenses of administration, nor does it increase liabilities. It is a case of where the beneficiaries of the bank have everything to gain and nothing to lose. It is a measure of unselfish relief, offered by the national government, at great cost to itself. There are no grounds for disparaging its wisdom or usefulness. In dealing with the question of the legal power of the liquidating agents of the bank to avail themselves of the advantage offered, the nature of the proceeding and its effect upon the rights of interested parties are of paramount importance.

The only reason for the legal limitations referred to in the books which circumscribe the ordinary power of receivers to borrow money is because the money borrowed is for expenses of operation and results in creating an additional liability prior in rank to the claims of creditors, and subjects the beneficiaries to the danger of having the estate dissipated or consumed in costs and charges of administration. But there are no such factors in the proposed transaction. The decisions of courts and rules laid down in textbooks concerning the power to borrow money for expenses of operation and maintenance have no application here.

The power and duty to liquidate and wind up the affairs of insolvent banks in this state is vested by law in the bank commissioner under the supervision, in all essential matters, of the district court. The legislation concerning the matter is mainly directed towards avoiding the appointment of receivers by the courts, and confining the management of all such instiutions uniformly to the bank commissioner, who is a public officer and supposedly skilled in the banking business. There is nowhere evident in the statute any intention whatever to limit or restrict the manner of administering the affairs of a closed bank. When the whole of the statute is considered in the light of the law and practice of courts before its enactment, it seems clear that the Legislature intended only to take from the courts the power to appoint the person to act as receiver or liquidating agent. This is apparent from the definition of the powers enumerated in the statute. The independent authority granted to the bank commissioner relates only to those preliminary and routine matters usually exercised by an equity receiver without formal orders from the court, such as taking possession, filing inventories, giving notice to creditors, collecting debts, etc. In all essential matters, such as fixing the compensation of attorneys and assistants, the allowance of disputed claims, the sale or compounding of bad or doubt-debts, the sale of property and the payment of dividends to creditors, the approval of the district court is required. Up-

on final liquidation, the books, papers, and records of the bank must be deposited with the clerk of the court and held subject to the order of the district court. The least that can be said is that the management and supervision of such banks is vested by law jointly in the bank commissioner and the district court. For the purposes of this case, it is not necessary to make any fine distinctions as to the respective powers of each. This much is certain that the property and assets of an insolvent bank when taken over by the bank commissioner passes into the custody of the law, and its affairs are to be liquidated by the bank commissioner under the supervision, in all important matters, of the district court. *Nat. Surety Co.* v. *Pixton*, 60 Utah, 289, 208 P. 878, 24 A. L. R. 1487; *Hanson* v. *Sogn*, 50 S. D. 44, 208 N. W. 228; *Breese* v. *Bramwell*, 110 Or. 105, 223 P. 239; *Van Meter* v. *State ex rel. Mothersead*, 132 Okl. 230, 270 P. 41; *Mothersead* v. *Harris*, 148 Okl. 285, 298 P. 602; *Frederick* v. *McRae*, 157 Minn. 366, 196 N. W. 270.

This being an application for a writ of prohibition, our inquiry is limited to whether the liquidating authorities have the legal power or authority to make the loan in question from the Federal Reconstruction Finance Corporation.

If, as seems conceded, a chancery receiver with the approval of the court appointing him would have such authority and power, why is it to be denied the bank commissioner in the present case, who has the approval of the district court? To merely say that he is not strictly a chancery receiver is not a sufficient answer. For, besides being in substance the same legal character as a receiver appointed by a court of equity, he is invested by the statute with general powers. He is authorized "to collect money due to such bank, and to do such other acts as are necessary to preserve its assets and business." It is suggested that he would have this general power inherently by virtue of his position and duty, but the legislature has made it certain by express words. *U. S. Bank of St. Louis* v. *Pritchard* (Mo. App.) 20 S. W. (2d) 939.

It must be remembered that depositors in banks are not ordinary creditors. They have not lent their surplus money to a borrower. They have deposited their funds, depending upon withdrawing them at any time without notice for daily use. Many of them rely upon such funds for the conduct of their business enterprises, others for their daily bread. When a bank suspends payment, the community it serves is financially paralyzed. The demands of its depositors are urgent and often desperate. This fact cannot be ignored by the courts, nor by liquidating agents. It is imperative to accumulate funds as rapidly as possible to relieve the distress of creditors. On the other hand, there are always assets in a bank denominated "frozen"; that is to say, assets which cannot be readily converted into money, but require time to liquidate. To dispose of them quickly means great sacrifice and loss.

To meet just such a predicament the national Congress has set up the Reconstruction Finance Corporation and authorized it to make loans upon most generous terms to suspended banks in process of liquidation. In view of the urgent need of depositors for payments on account of their claims at any cost, and the certainty of sacrifice and loss if the frozen assets of the bank are immediately foreclosed or sold, is it not a preservation of the assets and business of the bank to borrow money on its assets and save to its creditors the prospect of realizing the fair value of the frozen assets? And what is the peril of such a transaction? The money is borrowed, at a low rate of interest, and it goes at once to the creditors. It is not a case of money being borrowed for management or operation of the business. The liabilities are not increased because the sum borrowed goes immediately in reduction of liabilities. The assets pledged go to a magnanimous and friendly lender, whom there is every reason to believe will carefully and faithfully convert them into money to the best advantage of the borrower. But with the wisdom of the scheme we have nothing to do. The decision of that question is vested in others. We have

only to deal with the legal power of the liquidating agents if they deem the plain expedient.

Even treating the matter as the exercise of power by a public officer, independent of judicial control, the authority of the bank commission to make the loan proposed should be sustained. The grant of power to him by the Legislature is remedial in its nature and ought to be liberally interpreted to accomplish the purposes intended by the law. Ex parte Smith, 160 Ky. 83, 169 S. W. 582. There is no warrant in principal or precedent for a narrow and strict construction of his powers. But here the bank commissioner has applied to and received the approval of the district court for his proposed relief. Under the requirement of the statute that he may sell property only upon the order of the district court, it was appropriate to have such order, as the contemplated pledge is analogous to a sale.

A review of the sufficiency of the grounds alleged and proved by the bank commissioner for the order of the district court and the procedure there followed are not within the scope of this proceeding. This is not an appeal or writ of error. In determining whether or not a writ of prohibition will be issued, we are limited to the question of the legal power of the liquidating authorities to make the proposed loan. There is no requirement of law for notice other than was given or any particular form of application or hearing as essential to the power of the court to make the order in question. The fact that writ of review in aid of the writ of prohibition was issued does not enlarge our inquiry. Even a writ of review is limited to questions of jurisdiction and power. Besides this, there is nothing in the pleadings, briefs, or arguments challenging the power in question on account of legal errors in the procedure or the sufficiency of the showing for the order of the district court. The matter was submitted upon the proposition that the liquidating agent had not the power asserted in any case. There is no valid reason why this court should interpose a bar to a proceeding calculated to highly benefit the un-

fortunate creditors of the bank involved. It is only by a narrow and strict interpretation of statutes and a consideration of mere legal errors not going to jurisdiction that grounds may be found for judicial intervention.

The writ should be denied.

FOLLAND, J.
I concur in the views expressed by Mr. Chief Justice CHERRY.

On Petition for Rehearing.

STRAUP, J.

The original opinion herein was filed April 26, 1932. On stipulations by the parties and at their request we granted several extensions of time to file a petition for a rehearing, the last extension being to and including October 15. No petition was filed until October 11, when one was filed on behalf of the bank commissioner.

One of the questions, the power or authority of the bank commissioner with or without aid of the court to borrow money from the Reconstruction Finance Corporation to pay dividends to depositors and creditors and pledge the whole of the assets of the insolvent bank to secure its payment, being in this jurisdiction a new and rather complicated question, the publication of the opinion in official reports was withheld until the time to file a petition for a rehearing had expired, or, if one was filed, until it was disposed of.

By the petition it again is urged, as it was on the original hearing, that the language of the statute whereby the bank commissioner is directed to take possession of the property of an insolvent bank and to "do such other acts as are necessary to preserve its assets and business and proceed to liquidate the affairs thereof," authorized the commissioner to borrow the money from the Reconstruction Finance Corporation and pledge a part or the whole of the assets to

secure the payment of the loan, and authorized the court to direct him to do so. To support that, the case of in re Liquidation of Cashmere State Bank, the opinion of which was filed August 15, 1932 and reported in (Wash.) 13 P. (2d) 892, 893, is cited and chiefly relied on by the petitioners. The decision is by a divided court, five to four. In the main, the majority opinion supports the contention of the petitioners. The opinion, however, concedes that "neither statute nor judicial decision expressly confer authority upon the state supervisor of banking to borrow money and pledge the assets of the insolvent bank in his custody to pay dividends. It must also be conceded that equity receivers do not, by virtue of their mere appointment as such, possess such powers." But it there was further considered that, while the banking act provided for the doing of certain acts by the supervisor with the approval of the court, which "include the sale and compromise of bad or doubtful debts, the sale of real and personal property, and the payment of dividends out of the ultimate funds remaining in his hands after the payment of expenses," yet such provisions were not restrictive and by their enumeration do not exclude others not specifically designated. The majority court further observing that, "bearing in mind that the state supervisor of banking is an executive officer of the state, that his duties are of a public nature, and that in the discharge of them he acts in the public interest, we are induced to place such construction upon the statute as will enable him to administer speedily, adequately, and comprehensively the trust imposed upon him," thus reached the conclusion that the court was authorized to direct the supervisor to borrow the money for the purposes stated. The dissenting members did not concur in that, and held such a construction not justified by the statute, and with respect thereto expressed views similar to those expressed by us in our original opinion.

For reasons stated in our opinion, where the statute in such particular is exhibited, we do not feel at liberty to give

it a construction similar to that given the Washington statute by the majority opinion, notwithstanding the similarity of the two statutes. The language of the statute, as it seems to us, is plain and its meaning clear, in which case there is no room for construction or license to search for its meaning beyond the statute itself and requires the application of the familiar maxim, that a thing expressed puts an end to implication (25 R. C. L. 958), and that no motive, purpose, or intent can be imputed to the Legislature in the enactment of a law other than such as are apparent upon the face and to be gathered from the terms of the law itself. 25 R. C. L. 962. In applying the maxim, "Expressum facit cessare tacitum," the Missouri court in the case of *Caldwell* v. *Ryan,* 210 Mo. 17, 108 S. W. 533, 537, 16 L. R. A. (N. S.) 494, 124 Am. St. Rep. 717, 14 Ann. Cas. 314, said that, "where a lawgiver sets down plainly his whole meaning, we are prevented from making him mean what we please ourselves."

Still whatever room there may be for difference of opinion as to that, for other reasons and grounds disclosed by our original opinion, it nevertheless follows that the ruling granting the writ should be upheld.

Our attention also is called to the case of the Supreme Court of Wyoming, State of Wyoming, on relation of *B. W. Richmond* v. *District Court et al.,* 14 P. (2d) 673, filed September 27, 1932, but not yet published [in State report], wherein that court also considered the question as to the authority of the district court to authorize and direct the state examiner in charge of liquidation of an insolvent state bank to procure a loan of $150,000 from the Reconstruction Finance Corporation and to distribute the funds of the loan to the depositors and creditors of the bank, and reached the conclusion that no such authority or power was possessed by the court, and hence restrained the district court and the examiner from carrying out the order directing the examiner to borrow the money. As disclosed by the opinion, the statute so far as here material is similar to our statute.

Upon further consideration of the case, we still are satisfied with the results reached in our original opinion. The petition for rehearing therefore should be and is denied.

ELIAS HANSEN and EPHRAIM HANSON, JJ., concur.

CHERRY, C. J., and FOLLAND, JJ., dissent.