### GUTTERSON & GOULD v. LEBANON IRON & STEEL CO.

(Circuit Court, M. D. Pennsylvania. January 8, 1907.)

1. RECEIVERS—MANAGING RECEIVERSHIP—PURPOSE OF.

A managing receivership of a private business corporation is never undertaken, except with the view of winding up its affairs and the sale of its property; the business being taken over and continued in order that the whole may be disposed of in the end as a going concern.

2. SAME—JURISDICTION—BILL BY GENERAL CREDITORS.

Doubted, therefore, whether a court has jurisdiction of a bill brought by general creditors of an insolvent iron and steel company, the sole purpose of which, as judged by the sequel, was to get receivers appointed and stave off lien creditors; the case in four years not having advanced a step beyond the filing of the bill and friendly answer made by the corporation confessing it. and the appointment of receivers under it, and the bill not being one to foreclose, nor justified as a proceeding to compel liquidation, and there being no winding-up statute of the state on which to predicate it, nor any general equity jurisdiction outside of that.

3. SAME—ACCOUNTING—BURDEN OF PROOF.

On an accounting by receivers, the burden rests upon them to justify and vouch their accounts, so far, at least, as they are questioned by exceptions.

4. SAME—LIABILITY OF RECEIVERS—MISMANAGEMENT.

While receivers are trustees, and, according to the established rule, are not liable individually unless they are shown to have been in positive fault, yet, when their management has resulted in a large loss and the creation of indebtedness which they have no means of paying, it hardly meets the charge to simply say to those whom they owe that they have nothing with which to pay, without any attempted explanation.

5. SAME—PERSONAL LIABILITY—UNWARRANTED EXPENDITURES.

Receivers appointed merely to carry on the business of a corporation and keep it a going concern at suit of creditors will be charged with personal liability for money paid out in satisfaction of debts of the company, hav-

ing no relation to the conduct of the business, although such payments were authorized by the court on their ex parte application, where their representations that they were in funds to make the payments without detriment to the business were untrue, and they were in fact conducting the business at a loss, and contracting indebtedness which they had no means of paying.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Receivers, § 201.]

**6. SAME—MISMANAGEMENT.**

Receivers appointed to carry on the business of a private manufacturing corporation, who conducted the same for eleven months at a loss, contracting a large indebtedness which they have no means of paying, and who failed to keep cost sheets which would have shown the condition of the business and as were kept by like concerns, will be charged with personal liability for so much of such indebtedness as might have been prevented by proper care and attention to the conduct of the business.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Receivers, § 169.]

**7. SAME—PREFERENCES TO CREDITORS.**

It is the duty of receivers on ascertaining that the business of the receivership is being conducted at a loss to make no payments to its creditors except pro rata, and for preferences given after that time they will be held personally accountable to other creditors.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Receivers, §§ 312, 169, 183.]

On Exceptions to Report of Master, Passing Upon the Accounts of Abram Hess and J. Lansing Mines, Receivers.

L. L. Smith (Howard C. Shirk, with him), for exceptions.

No counsel appearing for the accountants.

ARCHBALD, District Judge. The receivers, whose accounts are in controversy, were appointed upon a bill filed December 2, 1902, by the general creditors of the Lebanon Iron & Steel Company, the appointment being secured upon the representation that the company was doing an extensive and profitable business, and that the value of its property largely exceeded the bonded and other indebtedness against it, all of which could be saved to the unsecured creditors and stockholders by proper management, under the direction of the court, but would otherwise be speedily foreclosed and sacrificed. Notwithstanding the views which were so expressed, the outlook, when carefully considered, was not altogether a promising one. The authorized bond issue of the company was $200,000, of which only $61,000 had been placed outright, the balance ($139,000) having been pledged to secure loans of $41,000, and the floating indebtedness being $163,000 beyond that; and, far from the expectations with regard to the receivership being realized, it has only ended in piling up additional obligations, which the receivers have practically nothing to satisfy. Starting out with available assets of some $40,000 ($8,982.72 of accounts receivable and $30,845 of personal property and materials), they are compelled to confess an indebtedness of their own contracting of over $32,000, to say nothing of an increase of secured loans of $2,000—$43,000 in place of $41,000 at the time of their appointment. To meet this they have only some $7,300 cash in hand and collectible accounts, together with possibly $4,516 of personal property with which they should be credited, making a net loss, as the result of 11 months' operations, of fully $60,000. This showing is somewhat relieved by payments which were made by

order of court for back wages, defaulted coupons, taxes, a mechanic's lien, and certain life insurance premiums; aggregating, all told, as it is said, some $13,000 or $14,000, although I have only been able to partially verify this amount. But with due allowance for these payments, whatever they were, a very serious discrepancy still remains, and the question is whether the receivers or their creditors should be compelled to bear the loss.

The situation is not an easy, nor, indeed, a pleasant, one to deal with; and, notwithstanding the unfavorable showing thus made for the accountants, no counsel appeared to represent them at the argument, and I am left to dispose of the case as best I may, without the benefit of their assistance. The mistake in the case starts with the bill, the sole purpose of which, as judged by the sequel, was to get a receivership and stave off lien creditors. That, at least, is all that was done; four years having elapsed since suit was begun, during which the case has not advanced a step beyond the filing of the bill and friendly answer made by the company confessing it, and the appointment of receivers under it. I seriously doubt the authority of the court to entertain any such case. It is not, as it will be noted, a bill to foreclose; neither can it be justified as a proceeding to compel liquidation, there being no winding-up statute in Pennsylvania upon which to predicate it against a private business corporation such as the defendant company, nor any general equity jurisdiction outside of that. Jacobs v. Mexican Sugar Co., 130 Fed. 589. That something of the kind, however, is requisite, is manifest. A managing receivership is never undertaken except with the view to winding up the affairs of the company and a sale of its property; the business being taken over and continued, in order that the whole may be disposed of in the end as a going concern. Kerr on Receivers (2d Ed.) 277, 278; Gardner v. Railroad, L. R., 2 Ch. App. 201, 212; Waters v. Taylor, 15 Ves. 10. The only thing in the present instance which locks that way is the prayer that the plaintiffs' debt may be ascertained and decreed to be paid, to effect which a sale might be necessary. Upon this slender thread, the bill being confessed (Tompkins v. Catawba Mills [C. C.] 82 Fed. 789), and no one seeming concerned to question it, I will assume that jurisdiction is complete, and, passing other things, will proceed to adjust as best I can, the rights and liabilities growing out of this unfortunate receivership.

In the proceedings before the master the burden was upon the accountants to justify and vouch the accounts which they had rendered, so far, at least, as they were called in question by exceptions, and not the contrary, as seems to have been the idea of the master in disposing of them. 2 Danl. Ch. Prac. 1226. So far as the mere matter of vouching is concerned (that is to say, the production of receipted bills to correspond with the disbursements claimed), the accounts having been accepted and passed, I will take it for granted that this was sufficiently done, although it is going a long way to accord this with respect to the pay rolls, credit for which was apparently allowed without any attempt to prove or verify them. But the mere vouching and passing of the accounts as they stand, as compared with the other questions

involved, after all, is a minor matter. The receivership, as is pointed out above, has resulted in a large deficit, which presents the real issue; and in view of it, it devolves upon the receivers to clear themselves of the charge of mismanagement, which on the face of things is against them. Receivers, no doubt, are trustees, and according to the established rule are not liable individually, unless they are shown to have been in positive fault. 23 Am. & Eng. Ency. Law (2d Ed.) 1096. But where, as here, they have run thousands of dollars behind, it hardly meets the charge for them to simply say to those whom they owe that they have nothing with which to pay, without any attempted explanation.

The inability of the receivers to make ends meet is due in part to the diversion of funds to the payment of matters with which they were not directly concerned by virtue of their appointment or the general purposes of the receivership. These payments were made by order of court, but ex parte, on petition of the receivers, and without opportunity on the part of the excepting creditors to be heard until now with regard to their validity, and are therefore only to be accepted as of prima facie validity.

The first of these was for the back wages due to employés, but of the propriety of this payment there can be no question. These wages were a lien on the real and personal property of the company by reason of its insolvency (Act May 12, 1891 [P. L. Pa. 54]), and, upon the appropriation by the receivers of the material and supplies on hand to run the business, they were under direct obligation to see that these claims were paid. It took $3,400 to do this, instead of $2,000, which the court authorized. But that is not material. Payment had to be made, whatever the amount, and was therefore justified. It may be that, out of extra caution, steps should have been taken, in the manner prescribed by the statute, to preserve these wage claims as liens upon the real estate, in order to secure reimbursement when the property came to be sold, as it evidently must be eventually. But these claims were liens upon the personal, as well as the real, estate, with apparently no superior rights in the one over the other, so as to assure this; nor, at that stage of the receivership, was there anything to suggest that it would be necessary. Payment was made in order to release the personal property, which was needed by the receivers in the business, of which those who dealt with them, as well as the general creditors whom they represented, thus got full and direct benefit.

The same is true of taxes past and current, which had to be paid or the personal property would be liable to be levied upon, and which the receivers therefore properly took care of, in order to protect it, without any order.

The payment of the mechanic's lien of Samuel L. Light, however, presents a different question. This was for material furnished in the reconstruction of the plant prior to the receivership, amounting to $1,092, and was superior in lien to the first mortgage bonds, or, at least, to a part of them. The plea for its payment was that it hampered the receivers in trying to use the bonds to make loans, to have it stand against the property. But this was not sufficient to justify

.it. It may. have been desirable to give credit to the bonds, to which the payment of the mechanic's lien no doubt contributed, but not at the expense of the receivership, from which it abstracted just so much money, which is now and was then badly needed to pay off creditors. The representation by the receivers, upon which the order to pay was .obtained, was that they were in funds to do so. But this was not the case, and they ought to have known it. In April, 1903, when the order was made, the iron business was badly demoralized, and the receivers were evidently running behind, which any proper oversight of their affairs would have made manifest. With clear sailing ahead of them, the paying off of this lien might have been warranted, or, if it was pressing, and had to be taken care of, an assignment would have preserved it against the property, and afforded them protection. But under the circumstances, and for the purpose advocated,. payment should not have been made, and the receivers must therefore make good to their creditors what was so taken from them.

The payment of past-due coupons is in the same situation. There were $3,030 of these, which the receivers got authority to pay the latter part of June, 1903, representing that this could be readily done out of current funds without detriment to the business; the inducement suggested being that thereby all the bonds would be put in good standing, without any default of interest, upon which a foreclosure could be threatened. No doubt, in a general way, it was desirable to have this so, particularly if the returns from the business warranted it, but decidedly not at the expense of the solvency of the receivership, as was the case; serious difficulty having been experienced for some little time before that to keep things running. Had the real facts been stated, as they ought, the order to pay would never have been given, and it thus affords no protection to the receivers at this time, who must assume responsibility for the misapplication.

Complaint is also made of the payment of insurance premiums on the policy of $25,000 upon the life of Richard Meilly. This policy was held by W. H. Perry, of Providence, R. I., who was the owner of $40,000 of bonds, and had been turned over to him, at the time he took the bonds in May, 1902, upon a guaranty that they would be redeemed and paid within two years, with accrued interest and 5 per cent. premium. This arrangement grew out of and goes back into transactions .with regard to the organization of the Iron & Steel Company and the acquisition of certain of its property, upon which there is no need to enter. The policy was a term policy, and had only a few years to run, and the company was under obligation to pay the premiums and keep the policy in force, in default of which Perry had the right to surrender it, and apply the proceeds in accordance with the terms of the guaranty. This he eventually did at the end of the two years, in May, 1904, receiving $10,050 from the insurance company, which he applied to the payment of interest and premiums, leaving $3,346 to be credited on his bonds. Soon after the appointment of the receivers, a premium on this policy became due, which they applied to the court for permission to pay, and it was given. Unfortunately, however, as in the other instances referred to, the facts upon which the order was

obtained were not only meagerly, but in some material respects incorrectly, stated. It was represented, for example, that the Iron & Steel Company was the owner of the policy, which was not the case, the reversion being in Mr. Meilly, from whom it emanated. Also, that some $17,000 had been paid upon it, and that that was its present value, which was far from true; the surrender value, a year and a half later, being not much more than half that sum. The payment of these premiums was clearly a mistake, and the order of court, having been obtained as it was, cannot be relied upon to justify it. The insurance as it stood benefited a single preferred bondholder, to whom the policy had been assigned as an inducement to take the bonds. It may be, when realized, that the insurance would go to reduce their amount, as it did in the end to a meager extent, the most of it, however, being absorbed by the guaranty with regard to premium and interest. But, as has been already said, the first concern of the receivers was the business which they were appointed to manage, and if anything was to be diverted from that, they were bound to see that it could be safely done; which, whatever may be said of it when the first premiums became due, was clearly not the case as to the later ones. It may be, as a diversion of income for the benefit of the bonds, these premiums can be yet recovered out of the property ahead of the bonds, upon a foreclosure or other similar disposition of it, which is perhaps true, also, of some of the other payments which have been discussed. But the receivers must take the risk of that, and not their creditors, who are not to be put off upon any such uncertain hope. The amount which was paid on account of these premiums is left in some doubt by the record, but, so far as I can make out, was between $2,000 and $3,000. It will be for the master to determine this definitely upon the rehearing, if it becomes material. There were also policies upon the life of Mr. Light, somewhat similarly situated, with regard to which, however, better counsels fortunately prevailed; the receivers, when the premiums came due, not deeming it advisable to pay them.

Even more serious, however, than the diversion of funds from the business, is the charge of direct mismanagement, and chief in this is the failure of the receivers to keep track of how the business was running. So far as it was reasonably possible, according to ordinary business methods, it was clearly incumbent upon them to do so, and the fact that almost from the beginning the plant was run at a loss, apparently without their knowing it, calls for an explanation. How did this come about? And what right had they to run into debt so tremendously as they did? The business was not their own, and they were not in a position to take any chances with it; nor in putting them in charge could it have been understood that they were to carry it on regardless of results and at all hazards. This was not the kind of management which the court looked for and had reason to expect. The purpose of the receivership was to keep the property together, in order to have it as a going concern, and not to dissipate it, and, above all, the receivers were bound to see that they were not getting behind, and to stop short if they were, until it was ordered otherwise. If it fell upon them unawares, without fault of their own, and not-

withstanding the exercise of due precaution, well and good; but this is not to be taken for granted. The parties with whom they dealt and who gave them credit had no means of knowing how it fared with them. It was the receivers' duty to see to that, and others had a right to rely that they would. The burden, therefore, is on them now to show that they took the proper steps to do so, in default of which mismanagement stands confessed and personal liability follows. That the condition of the business could have been readily ascertained, there can be no serious question. This is done by means of cost sheets, made up from time to time, by which the cost of production is carefully figured out; and it was testified by those familiar with iron and steel manufacturing that a business of this character could not be safely carried on or kept within bounds without them. The attempt to do so by the receivers invited just what happened, and cannot be regarded as other than a piece of gross mismanagement, for which there is no extenuation. It cannot be ascribed to ignorance, for Mr. Hess was familiar with the practice when business manager for Mr. Coleman. The only excuse offered is that it involved so much labor as to be practically out of the question. An inventory of the raw material was required each time, as it is said, as well as the taking account of the finished product, both of which were complicated and expensive; but others do not seem to have found this to be the case, and, even if it were, if it was a necessary precaution, prompted by the ordinary methods observed in a business of this character, it could not be dispensed with upon any such plea. Instead of cost sheets, the receivers seem to have relied on estimates made by Mr. Light, their superintendent; but these were infrequent and superficial, taking only the most general account of things, and amounting to little more than a rough guess. The only safety was in an accurate figuring out in detail of the various items entering into the cost of the product, which conservative business methods, such as the receivers were bound to pursue, imposed on them as a duty. To the failure to observe it is directly attributable the contracting of debts, which they now have no means of paying, and it follows, as a matter of justice, that they must bear the loss occasioned by this neglect. They admittedly knew, fully two months before the mill was shut down, that they were losing money, which would at least make them liable for the deficit during that time; but, outside of and beyond that, they are responsible for whatever from the beginning they might have prevented by the keeping of cost sheets, which practically covers the whole indebtedness unpaid.

The arrangement with J. B. Newkirk & Co. was also a bad one, and should not have been made. By it the receivers tied up the whole of their product to a single customer, to whom they disposed of it at a discount, and practically according to the figures he might name, instead of taking advantage of the market, and placing it where it would realize the most. It is true that they needed money, and it may be that 2 per cent. is the usual charge for making advances upon shipments; but 30, or, at most, 60, days after they got started would have put them in funds, and the power of the court would seem to have been ample to give them credit and keep them running for that short space, after which it would not have been necessary. At all events,

the price was too high to pay for the accommodation. A private individual might have taken advantage of it, compelled by his necessities, but not a receiver, who is not supposed to resort to such extreme and costly business expedients. No doubt the accountants had the advice of counsel, but this was a business, and not a legal, matter, and the advice of counsel, therefore, is of no consequence. It would have been more to the point, in so important a matter, to have applied to the court for direction. The complete way in which the receivers put themselves into the hands of their agents by this arrangement is shown by the fact that, when the mill was finally shut down, all that was coming to the receivers from sales was forthwith appropriated on account of loans, although these were supposed to be for a definite time, and to be amply secured by bonds which had been put up as collateral. Whether this offset could be lawfully made, under the circumstances, in view of the insolvency of the receivership, I will not undertake to say.

Complaint is also made because Mr. Light was retained by the receivers as superintendent of the mill, the Iron & Steel Company, as it is said, having got into the existing difficulties because of his mismanagement. With the mill turned over to Mr. Light, according to this argument, and the finances to Newkirk & Co., no wonder that the receivership was a failure. It must be confessed that the previous business record of Mr. Light does not seem to have been altogether a successful one; but, whatever it was, he was an iron man of considerable experience, if not, indeed, of recognized ability, and was apparently the only one immediately available. He was also intimately acquainted with these particular works, as well as the men employed at them, and was thus calculated to get the best returns therefrom; and while his management was again a losing one, the receivers are not so much to blame for employing him to run the mill as in not exercising proper supervision and control of the business outside of that, by which this might have been largely, if not wholly, obviated.

The sale of the Lickdale Chemical Works is also criticised; and, judged by the highly colored representations made with regard to their earning capacity, in the prospectus on which the bonds were sought to be floated, it might seem questionable. But the fact is that the company only had a lease of this plant, and, according to their experience with it, it did not pay the receivers to run it; it being cheaper, as they found, to buy the charcoal which they needed than to try and make it there. All that they owned or sold was the personal property in and about it, for which they got a fair price; and while it may not have been altogether provident to dispose of it to Mr. Light, who was not financially responsible, the receivers have assumed the collection of the balance which he owes, which is all that could be asked of them.

As already stated, for at least two months before they closed down the business the receivers admittedly knew that they were losing money. In view of this, and the insolvency which thus faced them, they were bound to see from that time on, if not before, that one creditor was not preferred above another; each being entitled to equal treatment, and to a pro rata payment from the available assets in their

hands. The receivers awoke to the idea at last, but they should have done so earlier. Instead of this, however, some creditors were paid in full, while others only got a part, and some were put off without anything. It is not possible from the data at hand to determine how far preferences of this kind were given, but to the extent that they were, the creditors who have now to take less than they otherwise would are entitled to require that the receivers make good the difference.

As the result of these conclusions, the account of the receivers must go back for material readjustment, and it may be well to indicate just how it is to be restated. The receivers will be charged with the available assets which came into their hands at the beginning of the receivership, including accounts receivable and material and supplies, as determined by the corrected inventory, and also with all moneys received by them from the business outside of that. They will be credited, on the other hand, with the disbursements made, the uncollectible accounts which they have on their books, and other undisposable assets. In order to meet the claims of creditors, they will be further surcharged with an amount, which, with the cash on hand and the available assets, treated as such, will be sufficient to pay in full the unsecured outstanding indebtedness of the receivership and the cost of the accounting, which they must also bear. To prevent misunderstanding, it may be well to note in this connection that while all the matters which have been considered contribute, each to the extent that it goes, to this result, this is particularly true of the charge of mismanagement in running the business at a loss, without the ordinary checks by which it would have been prevented, to which the contracting of the unpaid indebtedness, without anything to meet it, is directly traceable, and which is thus, of itself, sufficient to sustain the surcharge which it is unfortunately found necessary to make.

Included in the indebtedness to be taken care of are, of course, the fees of counsel; but not as a preferred claim, as allowed by the master, nor to an amount exceeding $1,000, which is the full value, in my judgment, of the services rendered by the three counsel associated together in directing the receivership, and which is not to be increased by reason of numbers. The special counsel employed to resist the efforts of creditors who got judgments, and levied upon the personal property in the hands of the receivers, has been sufficiently compensated, as it seems to me, by the amount already paid. The attempts to stay execution in the common pleas and superior court, upon which more is claimed, were useless as well as futile. Had application been made to this court, as it had to be in the end, it would have saved all this trouble and expense; the property being in the charge of the court, whose authority was ample to see that it was not disturbed.

The exceptions, to the extent indicated, are sustained, and the accounts of the receivers are referred back to the master, with directions to restate the same in the manner pointed out, and thereupon to distribute, to the parties entitled thereto, the balance with which the accountants are thereby found to be chargeable.