ELMER NASLUND ET AL., Plaintiffs, v. MOON MOTOR CAR COMPANY, Defendant, AMERICAN HARD RUBBER Co. ET AL., Appellants, CATHERINE NOLAN TAYLOR, Executrix of the Estate of SENECA C. TAYLOR, Respondent.—134 S. W. (2d) 102.

Division One, December 13, 1939.

466

*Burnett, Stern & Liberman, Edwin Grossman* and *Donald O. Cramer* for appellants.

*Harold R. Small* for respondent; *Carter & Jones* of counsel.

BRADLEY, C.—November 15, 1930, a stockholder of the Moon Motor Car Company, St. Louis, filed suit against the company, alleging mismanagement, dissipation of assets, etc., and asked for the appointment of a receiver. On the same day that the suit was filed, Seneca C. Taylor, a member of the St. Louis Bar, was appointed temporary receiver. November 20, 1930, an amended petition was filed in which certain creditors joined as plaintiffs. December 2, 1930, Taylor was made permanent receiver, and later, other creditors intervened. March 25, 1935, Taylor was removed as a receiver because of his sickness, and George P. Dorris was appointed as successor receiver. May 24, 1935, Taylor filed his final report and application for discharge. October 18, 1935, the American Hard Rubber Company and other intervening creditors filed exceptions to the final report, and June 8, 1936, the successor receiver also filed exceptions to the report. These exceptions were, in the main, the same. A trial was had on the exceptions, which resulted in a finding for Taylor, overruling all exceptions, approving the report, and finally discharging Taylor as receiver.

The intervening creditors and the successor receiver filed a joint

motion for a new trial, but the successor receiver later withdrew from this motion. The motion was overruled and the intervening creditors appealed. Seneca C. Taylor died May 5, 1937, after the appeal, and the cause was revived here in the name of Catherine Nolan Taylor, executrix of the estate of Seneca C. Taylor.

The final report of the receiver and the exceptions thereto occupy the status of pleadings, the report having the relative status of a petition or complaint, and the exceptions having the relative status of an answer. [Johnson v. Central Trust Co., 159 Ind. 605, 65 N. E. 1028; Citizens' Trust Co. v. Wheeling Can Co., 199 Ind. 311, 157 N. E. 441; Oil Fields Corp. v. Meek, 175 Ark. 318, 299 S. W. 29.] And the analogy continues in that the burden of proof rests on the receiver as upon a plaintiff. [Gutterson & Gould v. Lebanon Iron & Steel Co., 151 Fed. 72; Commonwealth ex rel. Carson v. Monongahela Valley Bank, 239 Pa. 254, 86 Atl. 719; In re Magner, 173 Iowa, 299, 155 N. W. 317; 4 Bogert's Trusts and Trustees, sec. 971 (9).] At the trial below Taylor took the burden and went forward as does the ordinary plaintiff.

Hereinafter, where we use the term *receiver,* the reference is to Taylor, unless otherwise noted. Objectors contend: (1) That the receiver *operated* the Moon Motor Car Company plant contrary to the orders of the court, and paid out $47,047.13 in expenses for which sum he should not be allowed credit; (2) that the receiver needlessly paid $6938.49 to what is termed liquidating managers; (3) that he wrongfully paid $2373.57 to certain general creditors whose claims accrued prior to receivership, and paid one receiver creditor $1000 more than was owed; and (4) it is contended that the whole of the allowance ($15,000) to the receiver should be disallowed. The total which the objectors say should be disallowed is $72,359.19.

December 11, 1930, nine days after Taylor was made permanent receiver, he filed "an application for order to liquidate." The application stated that the Moon Motor Car Company "has on hand at the present time a large stock of raw materials, equipment and automobiles which are depreciating daily, and that, in the opinion of your receiver and his attorneys, it is for the best interest of the estate that said property be put in a salable condition and be sold." The prayer was for an order authorizing and directing the receiver "to employ appraisers, clerks, and necessary employes to put said property in a salable condition, to sell said property to the highest bidder at such times and places as in his opinion are most advantageous for the estate, to pay the necessary expenses incident to the sale of this property, and for such other powers of receivers in like cases." Upon the filing of the application to liquidate the court ordered that that the receiver "liquidate as prayed for in his application." However, he did not liquidate. Instead, he sold, when and where he could, cars and parts on hand, and manufactured or assembled and

sold ten Ruxton cars (a car made by the Moon Motor Car Company) and nine chassis. In the final report the receiver asked and was allowed, among others, these credits:

| | |
|---|---:|
| Watchmen and office | $36,992.62 |
| Porters | 1,131.00 |
| Firemen | 993.84 |
| Light, power and gas | 4,352.60 |
| Telephone and telegraph | 1,768.94 |
| Coal | 1,174.29 |
| Missouri District Telegraph Company (automatic burglary alarm system) | 2,303.71 |
| Insurance and bonds | 882.41 |
| Accruals as shown by final report: | |
| Watchmen—pay roll less Mr. Crider's salary | 7,018.16 |
| Mr. Taylor, for insurance | 485.06 |
| Mr. Blair, for insurance | 1,092.16 |
| American Auto Insurance Co., compensation insurance | 230.33 |
| Insurance Agency in 1931-1932 | 5,665.00 |
| Union Electric Light & Power Co. | 1,077.12 |
| Laclede Gas Light Co. | 94.45 |
| Missouri District Telegraph, automatic burglary alarm system | 449.71 |
| | $65,701.40 |

Objectors say that had the receiver liquidated as he asked for and as the court ordered, the above expenses, instead of being $65,701.40 would have been, reasonably estimated, as follows:

| | |
|---|---:|
| Watchmen—full salaries paid by Mr. Taylor to all watchmen until February 1, 1931, at which time handling of parts should have been completed | $ 3,665.38 |
| Watchmen—two watchmen at $75 a month from February 1, 1931, to March 24, 1935 | 7,475.00 |
| Fifty per cent of payments for insurance shown by final report | 4,177.48 |
| Twenty-five per cent of payments for firemen, porters, telephone and telegraph, light, power, and gas, coal, Missouri District Telegraph Company for watchman service, shown by final report | 3,336.41 |
| | $18,654.27 |

The difference is $47,047.13. The order to liquidate implied, we think, that such should be done within a reasonable time, which objectors say would have been by April 1, 1931, and reckoning

to that date they arrive at the above estimated expense, $18,654.27. The receiver proceeded somewhat as if the Moon Motor Car Company could and would be rehabilitated and put back on its feet as a going concern. And prior to July, 1931, the "receiver was optimistic" and said that the "creditors . . . would receive one hundred cents on the dollar," and that "a partial distribution could be expected in July, 1931." As matters finally washed out, creditors, whose claims amounted to $350,588.19, according to a report by the successor receiver filed December 11, 1935, got nothing.

In his final report, the receiver reported receipts totaling $100,-804.90, and disbursements in the sum of $100,800.38. The receipts included $889.11, cash on hand November 15, 1930, when a receiver was appointed. The larger receipts were: Sales of automobiles, $37,578.15; accounts receivable, including cars sold from warehouses, $21,205.35; received in settlement of suit against former officers, $9075.11; money borrowed by the receiver, $7000; sales of auto parts, $6586.90; machinery and equipment sales, $4181.08; sales of Ruxton auto parts, $3249.96; drafts discounted, $2700; sale of furniture and fixtures from office, $2656.92; cash transfer-offset in disbursements, $2061.74; notes receivable, $700; certificate of deposit, $600. The receipt items above given total $97,594.71. Other receipt items totaling $3210.19, and 17 in number, ranged in amount from 45 cents to $284.48.

The larger disbursement items were: Payrolls, $44,146.99; for material, $9293.23; part payment on allowance to receiver, $7567.50; the $7000 borrowed money repaid; storage, freight, etc., in bringing company property to St. Louis, $5931.86; light, power and gas, $4352.60; advances, $3050; Missouri Dist. telegraph watchman service, $2303.71; legal expenses, $2142.37; cash transfer-offset in receipts, $2061.74; telephones and telegrams, $1768.94; freight on material, including consignment inventory from Hartford, Wis., $1536.64; sight drafts discounted, returned, $1350; coal, unloading, etc., $1174.29; insurance on bonds, $882.41; accounts receivable, $863.55; rent $690; franchise taxes, $641.18; interest on notes, $569.61; water licenses, $533.87; to receiver for insurance premiums paid by him, $514.94. The disbursement items above given total $98,375.43. Other disbursement items totaling $2424.95, and 26 in number, ranged in amount from $2.70 to $396.09.

In addition to the above disbursement items the receiver incurred obligations, not paid by him, totaling $19,186.21. The larger of these unpaid obligations were for: Insurance, $7472.55; watchmen, $7018.16; accountant, $1630.04; light and power, $1077.12; receiver's bond premium, $750; attorneys fees, $500; Missouri Dist. telegraph watchman service, $449.71. The unpaid obligations mentioned total $18,897.58. Other unpaid bills, totaling $288.63 ranged in amount from $5 to $153.05.

May 1, 1931, the receiver filed an application asking for an allowance to him as "part compensation for his services." The application was heard on the day filed, and the court allowed $15,000. At the time of the receiver's removal $7152.15 of this allowance had not been paid, and this item is listed in the record as among the unpaid obligations incurred by the receiver. The $7152.15, and $485.06, advanced by the receiver to pay insurance were paid by the successor receiver December 5, 1935.

The receiver at the trial defended his conduct in failing to liquidate in compliance with the court order of December 11, 1930, on the ground that he proceeded in accordance with oral directions given, from time to time, by the respective judges who presided in the equity division of the circuit court during the period of the receiver's administration of the Moon Motor Car Company estate. Also, the receiver gave the same reason for employing watchmen and others and paying them, without *court* orders and without notice to creditors. The receiver filed no report until February 23, 1933, and at that time he filed a report covering his activities from the time of his appointment to and including December 31, 1932. And beginning with January, 1933, the receiver filed monthly reports. However, the *filing* was not always monthly. Sometimes as many as three monthly reports were filed at the same time. Some of these reports were approved by order of record and some were not. It is not entirely clear as to whether the report filed February 23, 1933 was approved of record. Of this report the receiver testified: "They (items in the report) were approved, he (Judge Calhoun) had all of the vouchers and receipts at the time he approved them. Judge Calhoun, when he approved this report on February 23rd, 1933, got hold of Judge Hall, who was in this room in 1933, and he got hold of Judge Hartman, who was in there in 1931, and went over these matters, over all these vouchers and receipts before he approved them."

 "A general receiver is one appointed by a court of chancery by virtue of its inherent power, independent of any statute, and the ordinary chancery receiver is a ministerial officer appointed by the court to take possession of and preserve the fund or property in litigation." [53 C. J. 17.] And 53 Corpus Juris, 158, says that "a receiver should ordinarily apply for and obtain from the court authority to enter into a contract, incur indebtedness, or expend moneys of the estate in advance of so doing; and although previous authorization is not indispensable, if he acts without it he does so at his peril." Also, 53 Corpus Juris, 18, says that "a 'receiver' is distinguished from a 'manager' in that he receives rents or other income and pays ascertained outgoings but does not manage the property in the sense of carrying on the trade or business by buying and selling or otherwise."

Not only did the receiver, from time to time, advise with the respective judges sitting in the equity division, but there is evidence tending to show that a creditors' committee representing many, if not all, of the creditors kept in touch with what the receiver was doing. But all this would not justify a receiver in proceeding as though he were *a manager* instead of a *receiver*. But the receiver, in the present case, should not be denied credit for the credit items going to make up the $47,047.13, merely because he did not liquidate in compliance with the order of the court, and because he made and paid obligations without an order of *court*. We judicially know that economic conditions, generally, were bad when the receiver took charge November 15, 1930. [Krueger et ux. v. Licklider et al. (Mo.), 76 S. W. (2d) 113; Saline County et al. v. Thorp et al., 337 Mo. 1140, 88 S. W. (2d) 183; State ex rel. St. Paul & K. C. Short Line Railroad Co. v. Pub. Serv. Comm., 339 Mo. 641, 98 S. W. (2d) 699.] There is no claim that the receiver's final report, or any other of his reports, is false in any particular or that he received any remuneration directly or indirectly, except that allowed to him by the court. There is nothing in the record to support a denial of credits ($47,-047.13) to the receiver for money that he paid out, except his failure to liquidate and his managerial conduct. It is true that the creditors got nothing, but it would be pure speculation to say that the creditors would have received anything of consequence had the receiver undertaken to wholly and completely liquidate by April 1, 1931.

Measured by book value, valuable properties went into the hands of the receiver. A balance sheet of the Moon Motor Car Company as of November 15, 1930, showed book value assets of $2,442,881.88, but there is no claim that the actual value even approached the book value. The company manufactured the Moon, Diana, Windsor, and Ruxton cars, rather high priced cars, but discontinued the manufacture of the Moon, Diana, and Windsor April 1, 1930, and these, in the parlance of the trade, became "bastard" cars. Also, the record shows that the Moon Motor Car Company, on October 16, 1930, before receivership, sold for $26,500, to the General Parts Corporation "all stock and materials, supplies and parts" for the Moon, Diana and Windsor cars, and under this sale, the General Parts Corporation, according to a witness who had worked for the Moon Motor Car Company since 1922, "took those parts which were cream of the crop—they took everything that was salable."

While the receiver was on the stand the record shows this: "Now, Mr. Taylor, there is an exception, rather long, in which they charge you of having received property in the amount of $256,221.63. Did you ever receive property of such value? A. At the time I was appointed receiver, at the time I took charge of the company, there were no parts of automobiles except parts exclusively used in the manufacture of the Ruxton cars, and they were practically of no

value at all. . . . There were no parts worth $256,000.00. All the parts that were down there were used in the manufacture of Ruxton cars. Now, those parts I did get I got from the General Parts Company, which they purchased pursuant to the contract offered in evidence, Exhibit A, they bought them; they had them in their possession and were selling them from the plant from the 16th day of October (1930) until the latter part of February (1931). They left a lot of parts which I took charge of, and that is what they call the $256,000.00, the parts they didn't want and wouldn't take them from us.''

The real estate was the most valuable asset of the Moon Motor Car Company. The book value was $823,630.38, and it was sold, under court order, August 13, 1935, by the successor receiver, for $72,500. In view of the general economic conditions to which we had made reference, supra, there could be no assumption that the real estate could have been sold to better advantage in 1931 than in 1935. Of course, the administration of the successor receiver is not here involved, and we merely mention the sale price of the real estate by way of comparison between book value and the sale price.

While the receiver did not follow the order of the court to liquidate, he nevertheless endeavored to dispose of receivership property. The receiver testified that in·endeavoring to sell he wrote, or caused to be written, letters to automobile parts concerns all over the country; that ''the court suggested that that was the way to do it.'' Also, it appears that at the time of the trial, which commenced June 12, 1936, all of the assets had been sold and there was then ''slightly under twenty five thousand dollars'' in the hands of the successor receiver.

This cause is in equity and we are not bound by the conclusions reached by the trial chancellor. We try the case here de novo. However, it is our duty to give due deference to the finding and judgment below. The trial chancellor refused to disallow the credit items going to make up the $47,047.13, and we do not think we would, under the record, be justified in overturning that conclusion.

It is contended that the receiver needlessly paid out $6938.49 to F. G. Spoor and H. S. Hadley, referred to as *liquidating managers*. Prior to the receivership, Spoor was employed by the Moon Motor Car Company at $600 per month. Hadley was an attorney and was connected with a firm that represented some creditors of the Moon Motor Car Company. The contention of the exceptors is that Spoor and Hadley rendered no service to the receiver, and that whatever sum was paid to them was no more than a gratuity. Spoor was paid at the rate of $750 per month from about December 1, 1930, until May 6, 1931. Altogether, Spoor received $4,312.50. From May 1, 1931, until November 1, 1931, Hadley received $500 per month, or a total of $2625.

December 2, 1930, Hadley was appointed by the court as one of the attorneys for the receiver, but the receiver testified that he did not want Spoor and Hadley; that both of them were forced on him; that Spoor did not do much of anything; ''he was representing the creditors' committee to watch me, that is what he was supposed to do''; that he (Spoor) ''wrote letters to the creditors' committee telling the chairman what I was doing.''

Concerning Spoor, the receiver further testified: ''Q. He was an accountant? A. He was an officer of the court, and he was put in there by the creditors' committee, he was the only man they had watching the place, and they wanted him still there when I got there to take care of their stuff. Q. Well, he didn't have any experience in assembling automobiles, did he? A. Well, he was formerly with the Continental Motors Company. Q. Well, did you need him? A. Well, they seemed to think we needed him, the Judge seemed to think so, but I don't know whether I needed him or not, but they seemed to think I did. They wanted to put him in there, so I put him in. Q. Well, what did he do for you? A. Well, he seemed to think he knew everything about it; he kept writing the creditors' committee every day telling them what he was doing.''

The receiver further testified: ''Well, I didn't want Hadley in there as a lawyer and I didn't want Spoor as liquidating manager; I didn't want to have them around. Q. Now, then, did you finally discharge Spoor? A. Yes, sir, I finally got rid of him. Q. Well, what are the circumstances under which you discharged Spoor? A. Well, he seemed to figure he could get rich on seven hundred and fifty dollars a month; and they had Hadley in there for five hundred dollars a month representing the creditors' committee. Q. Well, how do you know the creditors' committee did that? A. Well, the court told me to hire Hadley to represent them and look after their interest. Judge Hamilton: Who told you? The Witness: The court told me to hire Hadley, and I talked to the court about it and I told him I didn't like Spoor, and he told me to hire Hadley.''

It is not necessary to set out further evidence as to the employment of Spoor and Hadley. So far as appears in the record they were employed at the instance of creditors. Also, it appears from the evidence of the receiver that the court *told* him to employ Hadley. Also, the record shows that both Spoor and Hadley rendered service to the receiver in the administration of the estate. It does not appear on what theory the trial court overruled the exceptions as to the amount paid Spoor and Hadley, but it could have been on the ground, and supported by the record, that the creditors were chiefly responsible for the receiver employing both Spoor and Hadley, and were, therefore, in no position to complain. We affirm the ruling of the trial court approving the credit to the receiver for the money paid to Spoor and Hadley.

■ It is contended that the receiver wrongfully paid certain creditors, and one creditor $1000 more than was owed. The amount of credits, under this complaint, which objectors say should be disallowed is $3373.57. The items going to make up the $3373.57 are:

Salaries earned by employees of the Moon Motor Car Company prior to receivership .................$ 745.00

Payment to H. S. Hadley for expenses for the Moon Motor Car Company for filing fees, etc., prior to receivership .................................... 219.88

Payments to Louis J. Portner for services for the Moon Motor Car Company and expenses prior to receivership 232.35

Payment to General Parts Corporation in full settlement for all claims ................................ 779.85

Payment to American Foreign Credit Corporation in settlement of a claim arising prior to receivership .... 396.09

Excess payment to Kissel Motor Car Company .... 1,000.00

The salary payments, totaling $745.40, were to E. Lestro, F. A. Ferguson, Carl Walthers, and J. S. Woolacot. The Kissel Motor Car Company, Hartford, Wisconsin, was doing certain work for the Moon Motor Car Company, and Lestro was sent to Wisconsin by the Moon Motor Car Company, to supervise that work. Ferguson supervised similar work in the plant at St. Louis. Walthers was foreman, at St. Louis, of the final test (of cars) division. Woolacot was sales representative on the Pacific coast.

The $219.88 was paid to Hadley for expenses incurred before the receivership for suit filing fees, stenographic service, long distance calls, etc., prior to the receivership. Hadley made written application to the court for payment of his account. An itemized statement was attached to the application. On this application the court ordered the account paid. The receiver testified that he did not remember whether he was present in court when the order was made to pay Hadley. "After the court made the order, I didn't make any dispute about it. Anything the court told me to pay, I paid it."

The $232.35 paid to Portner was for legal services ($225) and costs ($7.35) advanced, from October 1st to November 15, 1930. The Portner account was handled in a manner similar to the Hadley expense account, and it is not necessary to go into detail.

The payment of the $779.85 to the General Parts Corporation came about in this way, as we understand the record. As appears, supra, the Moon Motor Car Company, on October 16, 1930, prior to receivership, sold certain automobile parts to the General Parts Corporation. Between October 16, 1930, date of sale, and November 15, 1930, date of receivership, the Moon Motor Car Company sold from the parts, already sold to the General Parts Corporation, to the extent of $779.85. The receiver testified that the $779.85 was "their (the parts corporation) money, not our money."

Objectors, in their brief, give, we think, the correct story of the $396.09 paid to the American Foreign Credit Corporation, which, in substance, follows: The Moon Motor Car Company had sold a car to the Northwestern Motors, Limited, of Liverpool, England. The American Foreign Credit Corporation handled the transaction and had, prior to receivership, paid the Moon Motor Car Company the sum of $1707 for the car. The Northwestern Motors, Limited, upon receipt of the car, claimed that it was not as ordered and rejected it, and a compromise was finally effected by which Northwestern Motors, Limited, agree to retain the car upon a reduction of the price by $396.09. The receivership intervened and Mr. Taylor, as receiver, paid that amount in full settlement of all the claims, and the car was then retained by the Northwestern Motors, Limited.

The $1000 item came about in this wise: At the time of receivership, the Kissel Motor Car Company, Hartford, Wisconsin, had on hand a large stock of Ruxton parts owned by the Moon Motor Car Company. Storage and other charges accrued, *after* receivership, as we read, or rather infer from the record, amounting to $2980.44. In some way, not explained, the receiver paid out $3980.44 to satisfy this account. Mr. Crider, his auditor, was unable to explain it.

There is no claim that the employees, Lestro, Ferguson, Walthers, and Woolacot were entitled to a preference under Section 1168, Revised Statutes 1929 (Mo. Stat. Ann., sec. 1168, p. 1249). The law applicable to the payment of claims by a receiver is well stated in Progress Press Brick & Machine Co. v. Sprague et al., 228 Mo. App. 1116, 65 S. W. (2d) 154, l. c. 159, as follows:

"Now to the end that full and complete justice may be done between all parties in interest and payment of the claims made ratably and without priority or preference as between creditors of the same class, it is the duty of the court in control of a receivership to fix the time within which any and all claims against the estate shall be presented, to give due notice thereof, and to reserve any order of distribution until an opportunity has been afforded for the status of all claims and their order of priority to be determined. [State ex rel. v. Hartman, supra; 53 C. J. 310.] It is to be observed that the giving of notice to creditors is an essential prerequisite to the payment of claims, it being elemental that one whose rights will be affected by a proceeding in court should be notified in order that he may appear and protect his interests. It follows, therefore, that any payments made are subject to the rights of parties in interest to whom no notice had been given, even in the case of parties to the action in which the receiver was appointed and other parties of record who appear to be interested in the fund," citing 53 C. J. 314; Seabord National Bank v. Rogers Milk Produce Co. (C. C. A.), 21 Fed. (2d) 414; Ruggles v. Patton (C. C. A.), 143 Fed. 312; Martin v. Morse, 193 App. Div. 732, 184 N. Y. Supp. 441; Boice v.

Conover, 54 N. J. Eq. 531, 35 Atl. 402; Whalen v. Pasig Iron Works, 13 Phillipine, 417.

█ As we read the law, there can be no justification for the receiver in paying the items that went to make up the $3373.57, except as to the $779.85 paid to the General Parts Corporation. The $779.85 was not, in fact, the money or property of the Moon Motor Car Company, and the finding below for the receiver on this item should be and is approved. There is no support for the approval of the other items. An ex parte order of court will not and should not suffice, because in such case, as was the case here, there is no *opportunity* afforded to determine the status of claims as to priority, etc. [Progress Press Brick & Machine Co. v. Sprague et al., supra, 65 S. W. (2d) l. c. 159.]

█ Objectors insist that the whole of the $15,000 allowed to the receiver should be disallowed. ''Neglect, recklessness, or misconduct in the management of the trust estate in his hands may be sufficient to deprive a receiver of all right to compensation. . . . Also, where there is nothing in the administration of the trust to convict the receiver of want of integrity or good faith, mere want of foresight, or error of judgment,' in developing or managing the property or business, is no reason for denying him compensation. . . . The mere fact that the receiver continues the business at a loss furnishes no reason for denying him compensation, especially where no objection is made, or where the business is continued at the request of creditors of defendant, and the controversy as to compensation is between such creditors and the receiver, but it is otherwise where the controversy is between the receiver and creditors of the receivership and the bills incurred by him in continuing the business exceed the funds in his hands for distribution.'' [53 C. J. 382.]

There is nothing in the record to support recklessness on the part of the receiver. And there is no charge or claim of want of integrity or good faith, but it cannot be said that the receiver was entirely free from misconduct when he proceeded to *operate* the plant in the very face of the order of the court to liquidate. And especially should this be so as to receiver Taylor, because he was an able lawyer, with wide experience, and knew, of course, that a judge off the bench had no right or power to give directions as to the manner of administration of the estate. As appears, supra, Hadley was appointed as one of the attorneys for the receiver, but Judge James T. Blair, an able lawyer and a former member of this court, was, on November 18, 1930, also appointed as attorney for the receiver, but the receiver seldom consulted Judge Blair, and since he did not want Hadley, he likely did not burden him by frequently asking advice. The record shows that the receiver, in many instances, represented himself, and the result is remindful of the ancient quip as to the kind of a client a lawyer has when he represents himself.

There can be no excuse, in this case, for the failure of the receiver to conduct the administration of the estate according to law, and that he did not do so, in many instances, is admitted, and all such cannot be condoned on the question of his compensation. We think that the $7152.15 paid to the receiver by the successor receiver, should be returned to the receivership estate.

The judgment should be reversed and the cause remanded with directions to disallow all the items that go to make up the $3373.57, supra, except the $779.85, and to charge back to the receiver, the $7152.15 paid by the successor receiver, and enter judgment against the estate of the receiver for $9745.87, with interest at six per cent on the items that go to make up the $9745.87, from the time "said moneys were taken" out of the receivership estate. [Bushman et al. v. Barlow et al., 328 Mo. 90, 40 S. W. (2d) 637.] It is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.